Filed 6/6/13  P. v. Green CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHN B. GREEN,<br><br>Defendant and Appellant. | F061482<br><br>(Super. Ct. No. CF03903444)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Carlos A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant John B. Green stands convicted, following a jury trial, of assault with intent to commit rape (Pen. Code, § 220; count 1), sexual battery on a restrained person (*id*., § 243.4, subd. (d); count 2), and elder abuse (*id*., § 368, subd. (b)(1); count 3), during each of which he personally inflicted great bodily injury on a person who was 70 years of age or older (*id*., § 12022.7, subd. (c)). Defendant admitted prior strike (*id*., §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), serious felony (*id*., § 667, subd. (a)(1)), and prison term (*id*., § 667.5, subd. (b)) allegations. Sentenced to prison for a total unstayed term of 25 years to life plus 10 years and ordered to pay various fees, fines, and assessments, he now appeals, raising claims of evidentiary error and ineffective assistance of counsel. We affirm.

## FACTS

### *Current Charges*

Sometime around 1:15 or 1:30 a.m. on April 18, 1999, Angela Smith received a telephone call from her 92-year-old mother, Danica Pestich.[1] Pestich was "[h]ysterical." Smith told her to call 911.

At 2:57 a.m. that same date, the Fresno Police Department received a 911 call from Pestich, who gave an address in the 3100 block of East Belmont and said she had been attacked. She related that someone came into her house and tried to rape her.[2] She was in bed, but got up when she heard something in the kitchen. The intruder jumped at her, then she screamed and he put a hand over her mouth. He did not rape her, but had her hold "his private" in her hand. He put his hands over hers and made her "do it." He rubbed for a long time, then something spilled on her foot. At some point, the man knocked her down in the bathroom, and she hurt her arm and back. He told her not to call the police and then went to the store across the street. She thought he needed another

---

[1] Pestich died two years before trial.

[2] An audio recording of a portion of the call was played for the jury.

drink, as she smelled alcohol on him. She was afraid he might come back. When he spoke to her, he sounded Mexican or Black. He had dark skin, but she did not know his race because the only light came from her flashlight, which he was holding.

Fresno Police Officers Valentino and Valles responded to Pestich's residence. Pestich was upset and fearful, and did not want to let anyone in the house. Pestich's arm was injured, and emergency medical personnel were summoned and took her to the hospital.

On April 20, 1999, Detective Weiss of the Fresno Police Department's Sexual Assault Unit was assigned to the case. That same day, she and another detective went to Pestich's residence to interview her. Weiss collected a rug from off of the washing machine out on the back porch. The rug had been in Pestich's bedroom.[3] Pestich told Weiss that when her assailant ejaculated, some of it got on her leg, and she used the rug to wipe it off. Later, she moved the rug, along with sweat pants that had been lying next to it on the bathroom floor, to the back porch. Subsequent laboratory analysis revealed semen and an apparent blood stain on the rug.[4]

During this timeframe, follow-up investigation was conducted of people who were of interest, but none of the leads panned out. The semen stain eventually was sent to the Berkeley Department of Justice laboratory for DNA typing and the entry of the DNA profile into the CODIS (Combined DNA Index System) database.

In January 2003, DNA typing from the stain on the rug was submitted to CODIS. In early March of that year, a "hit" was reported. Weiss was notified. This was the first

---

[3]    There was some discrepancy as to whether the rug was collected on April 20 or 22, 1999, and whether it was booked into evidence the day it was collected or several days later. Weiss denied having access to defendant's semen between April 20 and 22, 1999, or putting any such biological fluid on the rug.

[4]    The sweat pants were also seized, but no stains of possible evidentiary value were found.

Weiss heard of defendant, whom she then researched. She eventually located him in another county and interviewed him. During this interview, which took place on May 9, 2003, defendant denied ever being at Pestich's house, assaulting her, or having had any relationship with any elderly females during the relevant timeframe. Defendant denied having sex with Pestich. When asked if he had any girlfriends or women in the area with whom he was having sex, he said there were other women in the area, but he was not specific about having sex with anyone. Told his DNA was found at the scene, he said it was not his and he did not have any idea how it could have been found there. Asked if he could have had some sort of consensual sexual relations with any elderly women in the area, defendant said he did not recall anything like that. During the interview, defendant maintained his position that it could not be his DNA and that he had never been to the location.[5]

During the interview, a blood sample was obtained from defendant. A DNA profile obtained from the blood was compared to the DNA profile obtained from the semen stain. The profiles matched. The probability that a random, unrelated individual would possess the profile obtained from the semen sample was approximately one in 2.5 quadrillion African-Americans, one in two quadrillion Caucasians, and one in 500 million Hispanics. As there were around seven billion people on earth, Shawn Kacer, the employee of the California Department of Justice crime laboratory in Sacramento who performed the DNA and statistical analyses, deemed this a "very rare profile." The fact defendant's profile was the same provided "very strong evidence" defendant was the source of the semen.

---

[5]     Pestich resided on Belmont, between First and Second Streets. Defendant's annual update of his Penal Code section 290 registration showed him residing several blocks away in 1999. Police contacts from that year revealed his presence in Pestich's neighborhood.

4.

*Prior Offenses*[6]

Around 4:00 a.m. on August 28, 1981, Bessie Kinley, who was then in her early 80's, was asleep in her apartment when she heard a noise and awoke to find a "dark man" standing in the corner. When she asked what he was doing there, he went into the bathroom and came back with a bath towel. He returned to the bathroom, then emerged naked, with cords from Kinley's bathrobes.[7] His penis was erect. He sat down on the bed within reach of Kinley, said he was tired, and asked if she minded if he took a rest. When she said, "if you don't rest too long," he crawled into bed and lay down. He shoved his penis at her leg numerous times. He did not get up until she told him that a guard came through at 5:00 and would catch him if he did not leave, whereupon he got up, dressed, and then sat and smoked a cigarette. He pulled her telephone out of the wall, saying she would call the police if he left it, and then left the apartment. Kinley subsequently discovered money and her car keys missing from her purse. Her television was also gone. When she looked out of her window, she saw an empty space where she had parked her car.

At about 8:30 that same morning, then 82-year-old Fay Lane was sweeping her sidewalk in front of her home in Berkeley, when a man wearing a distinctive shirt drove up in a car. After he left, she finished sweeping, then went inside. When she walked into the kitchen, a man wearing what looked to be the same shirt was standing before her. He had a nylon stocking over his face and used her dish towels to tie her hands. He said he wanted money and would not hurt her, but if she hollered he would kill her. He had her

---

**6** As all three of defendant's previous victims had died by the time of trial in the present case, their preliminary hearing testimony from defendant's prior case was read to the jury.

**7** At some point, Kinley discovered the man had put two pieces of her panty hose, which he had apparently cut, on the end of the bed.

5.

get the money she kept in a cup in the living room, then he tied her to a chair and put towels over her face. He then went upstairs and took more money from her purse.

Lane was able to free herself while the man was out of the room. She managed to open the screen door and yell for help, but then he put something in her mouth and threw her on the floor. He tied her hands behind her back, and gagged and blindfolded her. He then swore at her, and started tearing off her clothes and cutting them in strips. She could feel a knife slitting her clothes and stockings. The man then had intercourse with her. His breath was "awful," like "[s]omething decayed."

During this time, a couple of Lane's neighbors came over and started ringing the doorbell and knocking. The man paid no attention while he was having intercourse, but then he got up and headed toward the back door. Lane, who could not draw her breath, was eventually freed by the police. She was hospitalized for eight days, three of which she spent in intensive care.

A little after 3:00 p.m. on January 16, 1984, then 79-year-old Femie Vartamian, who lived in a different apartment in the same building in Berkeley as Kinley, returned from picking up her mail to find defendant inside her apartment, by her patio door. When she asked if he was fixing something, he said he was checking the doors. He stayed at the glass door for about 10 minutes, then fixed her screen door at her request. He said he had to check the other doors, and she lost sight of him when he went toward the bathroom.

When defendant came back from the bathroom area, he had something white covering his face up to the nose. He pushed Vartamian onto the bed and put towels on her face. He started to gag her, but stopped when she asked him not to because she had heart trouble and needed air. She offered to give him money, whereupon he tied her hands behind her with her nylon stockings, then moved her toward the drawer where she kept cash. He took the money, then pushed her down on the bed and put the towels on her face again. He told her to give him 10 minutes and not to look, or he would "tie [her]

6.

up good." While she lay there, unmoving, she heard him moving about the apartment, opening and closing closet doors and drawers. When she heard a bang, she opened her eyes and saw her side table, with the lamp and telephone, on the floor. The police subsequently determined the telephone cord had been cut. In addition to her money, two hand-carved boxes and her wristwatch were missing.

On May 20, 1985, in Alameda County, defendant was convicted by guilty plea of the forcible rape of Fay Lane, with the personal use of a dangerous or deadly weapon and the personal and intentional infliction of great bodily injury; the assault of Bessie Kinley with intent to commit rape; and the false imprisonment of Femie Vartamian by means of force or violence.

**DISCUSSION**

**I**

**ADMISSION OF PESTICH'S 911 CALL**

Defendant says the trial court abused its discretion, and violated his constitutional right to confrontation, by admitting Pestich's 911 call into evidence. We conclude that if error occurred, it was harmless beyond a reasonable doubt.

**A.    Background**

Defendant moved, in limine, to exclude the tape recording of Pestich's 911 call. He claimed (1) Pestich's statements lacked credibility, as there was evidence Pestich suffered from dementia (a claim defendant does not pursue on appeal); (2) her delay in reporting removed the call from any hearsay exception; and (3) the 911 tape was testimonial and, accordingly, inadmissible under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). The People argued the evidence was admissible under Evidence Code section 1240 and was not barred by *Crawford*.[8]

---

[8]    Further statutory references are to the Evidence Code.

A section 402 hearing was held. Officer Valentino testified that at 3:00 a.m. on April 18, 1999, she and Officer Valles were dispatched to a location in the 3100 block of East Belmont in response to a 911 call. They were the initial dispatch unit. When they arrived at 3:14 a.m., there was an elderly female — Pestich — in the house who appeared to be extremely shaken, and who was very fearful even of letting the officers in. Valentino had Pestich explain what had happened to her that precipitated the 911 call, and, although Valentino could not recall Pestich's demeanor, she remembered it was difficult to obtain information from her. Pestich related that she had gone to bed, then been woken at about 1:00 a.m. when she heard her back gate rattle. She did not give any indication how long the incident lasted before her assailant left.

The trial court listened to the 911 tape before making its ruling. The transcription of the recording showed the call was received at 2:57 a.m. The initial portion of the transcription reads as follows:[9]

> "D [Dispatcher]: 911[.]
>
> "V [Victim]: Hello, this is [ ] E. Belmont. I am attacked. I need a police.
>
> "D: What's wrong? What happened?
>
> "V: Somebody in my house and try to rape and me and.
>
> "D: They came into your house and tried to rape you?
>
> "V: Yeah, oh my god, oh my god (starts to cry).
>
> "D: Mam, what is your name ma'am?
>
> "V: Pestich .… [¶] … [¶] … Yeah. They call me, he told me, he left a little while ago. He told me not to call police.
>
> "D: Okay. Did you know who this guy was? [¶] … [¶]

---

[9] The record on appeal contains a transcription of the entire recording. We have had the actual recording transmitted to us and have listened to it.

8.

"V:  **(inaudible)** I really wanna do about this, that he pull me down two blocks from here.  [¶] … [¶]

"D:  Ma'am, listen to my questions.  Do you know who he was?

"V:  No ma'am, I never see him.  I, I, I, he, he did not, no light in the house, he used the flash, he took me flashlight, that's what he used.

"D:  Okay.  So he came to your house and he got inside your house?

"V:  Yeah.  Open, yeah, I was laying and I heard something in the kitchen, you know, like if somebody, in the kitchen, you know.  Uh, I try to get up to see uh, uh, you know, what is it, you know that flashlight.

"D:  How old are you?

"V:  I am ninety-two, please (pleading and starts crying again).

"D:  Ninety-two?

"V:  Yeah.  Oh (wailing), oh my god, what happen to me, my god.  [¶] … [¶]

"D:  Mam.  What did, what did he do to you?  Are you hurt?  Do you need an ambulance?

"V:  I am a little bloody all over **(inaudible)**.

"D:  What?

"V:  I got a **(inaudible)** he knocked me down in the bathroom.  I hurt my arm and, and back and everything.  Oh my god (pleading).

"D:  Okay ma'am.

"V:  Oh my god.

"D:  Do you need an ambulance?  Are you hurt?  Or bleeding?  Or anything?

"V:  Bleeding my arm.  Oh my god, can't you send me police?

"D:  Okay, I'm sending you police right, right this minute.

"V:  He told me, he told me not to call police.  He went, he cross the street.…  [¶] … [¶]

"D: Okay. Okay. Try and calm down so I can ask you uh, a whole bunch of questions, okay.

"V: Yeah.

"D: Okay. First, first thing. Do you need an ambulance? Do you think that you need an ambulance or no?

"V: I don't think so. I don't, I don't know yet.

"D: Okay. Did he, are you home by yourself?

"V: I am all, I am all alone, I ninety two years old.

"D: Okay. Did he, did he, what did he try to do you? After he got in the house, what did he do?

"V: He knock me down, I get up from my bed and something, heard something in the kitchen you know. [¶] … [¶] … And I uh, uh, I wanted to see who, what it was you know. And I, he jump at me you know I was sitting on the bed you know. [¶] … [¶] … I scream and he put a hands over my mouth. I thought he gonna choke me. Oh my god, what happened to me, my god, oh (moaning and pleading)[.]

"D: Okay, ma'am?

"V: Ahh.

"D: Okay.

"V: Oh, oh, my god. My god.

"D: Okay, so, so he put, you, you, you were screaming and he put his hands over your mouth.

"V: Yeah, Yeah, **(inaudible)**.

"D: And then what? And then what?

"V: Oh.

"D: What happened after that? It's okay.

"V: Oh, he went in the bathroom.

"D: He went in the bathroom?

"V: And he wanted water. To give him water. You know to drink water, he looks like a drunk.

"D: Okay.

"V: Oh my god. What happened to me, my god.

"D: And then what after? Did he leave?

"V: No, he didn't leave, he, he, came here. It was one o'clock. One o'clock. You sleep now. He told me not to call, call police.

"D: Oh, he came at one and he just left?

"V: Yeah. He just left.

"D: Did he rape you?

"V: No but he give me, he's, uh, sorry you know, to, to hold his uh, private, to hold in my hand, hands.

"D: He wanted, he wanted to what?

"V: To hold in my hand his private. [¶] … [¶] … Yeah, and all he wanna do is, but he hold my hands you know, ah (wailing and moaning) my god.

"D: Okay. It.

"V: Oh my god. [¶] … [¶]

"D: Okay. You're okay, you're okay, every.

"V: Oh my god.

"D: As long as you're not hurt okay.

"V: He told me not to call police.

"D: That's okay. You did the right thing. I don't care what he told you. You're doing the right thing.

"V: But he might come back.

"D: Okay. Can you give me a description of him? Is he white, black or Mexican?

11.

"V: He's, he sound, I don't know.

"D: You don't know?

"V: No, he sound like a black, he sound like a Mexican. He said. [¶] … [¶]

"D: Oh he didn't turn the lights on.

"V: No, no, no, he demand no to, no light, just a flashlight. My flashlight. Oh my god, what happened to me! Oh my god. Oh my god. Oh my god. What happened to me!

"D: Okay. You didn't happen to see which way he left-, he went?

"V: He went to store across the street, I think he need another drink. He.

"D: He was drunk? Did you smell alcohol on him?

"V: Oh yeah, oh yeah. Yeah, but he known what he's talking, you know, he told me he won't hurt me, you know, just don't, don't scream, don't, don't say anything, don't open your mouth. Oh, oh, he told me not to call police. Oh my god. [¶] … [¶]

"D: What else, what else can you tell me? Is there anything else that you can tell me that would help us catch him? Like, where do you think he went? Or anything like that?

"V: I think uh, I think uh, close to Cedar there is a, all night uh store you know and oil station, cross a street, and a Belmont.

"D: A store across the street?

"V: Yeah. Yeah. It's oil station and uh, uh, a store that's open day night.

"D: Okay so he'd, you didn't hurt and he didn't actually do anything to you?

"V: He, he want to rape me but, oh my god, oh oh oh my god, oh 'ku ku many'.[10]

---

**10** The parties agree this is a phonetic interpretation of something Pestich, who was Yugoslav, said in her native language.

"D: Hello.

"V: Oh.

"D: You're okay. You're, you're gonna be okay, we have the police on the way.

"V: Oh my god. Oh my god.

"D: 'kay. Are you, are you okay? Do you think you're gonna be okay?

"V: No, no I am not okay, my god. Oh, oh my god. [¶] … [¶]

"D: Did he do anything else to you? Did he hurt you at all?

"V: He knock me down and **(inaudible)** my arm and back. Oh. [¶] … [¶]

"D: How come, how come he stayed so long? What was he doing for two hours? What, what, what could be, what was he doing?

"V: Well he, we, used to standing around there and holding and he told me to hold his private you know.

"D: Okay but how long did he tell you to do that?

"V: A long long time.

"D: He was just telling you to do it though? That's all he.

"V: Yeah, he told me to do it.

"D: He didn't make you do it though?

"V: Oh yeah, he make it me do **(inaudible)**. [¶] … [¶] … Oh. 'ku ku' my god. My god what happened to me. He told me not to call police. He live down Second Street, he see me every day going to store. That's what he know. He was looking, do you have any money, they rob me two weeks ago when I was working on the side over there digging weeds, you know, and there was four cars on a side at the fish market, cross the street. And there was four cars there. I guess he see me, he went in the house but my door was, was not locked.

"D: Oh, it wasn't locked?

13.

"V: And he rob me four hundred fifteen dollars. And I, and he was looking out when a drawer, you know, I say I don't have any money, I told him I don't have, they rob me two, two weeks ago, four hundred fifteen dollars and, and  [¶] … [¶]  … And he was looking all over the drawer you know, if see there is money, I told him that there's no money, I was robbed you know, last, two, two weeks ago.  [¶] … [¶]

"D: So did he take any money at all?

"V: No, there is no money there.

"D: Oh okay.

"V: They took it, four hundred fifteen dollars.

"D: He did take it?

"V: No, no, two weeks ago, two weeks ago, not now because there isn't any."

The discussion between Pestich and the dispatcher then turned to Pestich needing to keep her doors locked in the future, how the suspect got into the house, and whether Pestich had an alarm system. Asked where her children lived, Pestich related that she had a daughter living in Los Angeles, and that she called the daughter because the man told her not to call police. Pestich expressed concern the man might come back and rape her. After further discussion about how the man got in and his having told Pestich not to call the police, Pestich related that the man was wearing heavy gloves and tried to choke her, and that he told her not to scream or even talk. The dispatcher asked if the man asked Pestich to have sex with him; Pestich answered affirmatively, and stated, "He ask me you know, to have a sex, or suck something I don't know and he try, he try to put a rubber on his private you know." She described how he had used her hand to masturbate until he ejaculated, whereupon something spilled on her foot. She then started pleading and crying again. The dispatcher told her to make sure she told the police officer what happened, and that an officer was just pulling up to the house. When Pestich expressed fear that it could be her assailant again, and that she could not see outside in the dark and

he told her not to call the police, the dispatcher asked if he had a gun or a knife. Pestich said no and described his clothes. The dispatcher told her to tell the officers, and asked if he left a condom or anything else behind. Shortly after, the police knocked at the door.

That completed the first 18 pages of the transcription. The rest of the recording consisted of Pestich talking to, and being questioned by, the police officers and ambulance attendants.

After argument, the trial court found the recording and transcript showed Pestich reasonably was still fearful for her safety and under the stress and excitement of the events that had just occurred, even assuming two hours had passed. Accordingly, it did not find spontaneity to be an issue. As for whether the statement was testimonial, the court found the officers were still trying to determine what had happened up to the end of the tape, and were gathering information about the crime, perpetrator, and perpetrator's location. The court acknowledged the officers were, subjectively, attempting to gather information that would be used for prosecution, but found that, from an objective viewpoint, the information they were gathering was for the purpose of determining what the perpetrator did, where he might be found, and the seriousness of the crime, rather than to testify at a future date or prosecute the perpetrator. Accordingly, it concluded the entire tape was admissible, as the statements were spontaneous and not barred by the prohibition on testimonial hearsay.

Defendant subsequently renewed his motion to exclude the recording. He argued that when interviewed, Pestich's daughter represented that Pestich telephoned her at 1:00 a.m. in a distraught state, and this contradicted the implication in the transcript of the 911 call that the perpetrator had just left. Defendant argued the statement was not spontaneous, but rather came after two hours of deliberation. The People responded that the tape clearly showed Pestich was still under the stress and excitement of the incident, and the fact her daughter — herself in her 70's — said, some 11 years after events, that she thought the phone call was around 1:00 a.m., was not crucial.

15.

After further argument, the trial court observed that while the statement did need to be spontaneous, it did not need to be instantaneous. Even assuming the time lapse argued by defendant, the court found it clear Pestich was "under the stress of the excitement while the reflective powers were still in the abeyance .…" The court found Pestich was "clearly in extreme fear" that the crime was not complete. Accordingly, it found the statements spontaneous, and not testimonial, at least while Pestich was talking to the 911 dispatcher. With respect to Pestich's statements to the officers, however, the trial court reconsidered its earlier ruling due to the "structured interaction" between the officers and Pestich. Finding a "substantial argument" the statements to the officers were testimonial, it ruled that only the first 18 pages of the call (the portion before the officers entered the residence) were admissible.

**B.    Analysis**

Defendant now contends the 911 call was not spontaneous, because (1) it was made several hours after the attack, after Pestich not only discussed what to do with her daughter but also spent some time thinking about whether to call the police, and (2) Pestich was upset about other crimes of which she had been a victim. Defendant further says that, assuming Pestich's statements to the 911 dispatcher fell within a hearsay exception, they should have been excluded as testimonial.[11] We turn first to the hearsay inquiry, as "in any *Crawford* analysis, the first question for the trial court is whether proffered hearsay would fall under a recognized state law hearsay exception. If it does not, the matter is resolved [because the statement is inadmissible], and no further *Crawford* analysis is required." (*People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 5; see also *People v. Blacksher* (2011) 52 Cal.4th 769, 810, fn. 26.)

---

[11]    It is undisputed that Pestich never testified at a proceeding in which defendant had the opportunity to cross-examine her.

16.

1.    Section 1240

Because Pestich's statements were made out of court and admitted for their truth, they constituted hearsay.  (§ 1200, subd. (a).)  "Except as provided by law, hearsay evidence is inadmissible."  (*Id*., subd. (b).)  Pursuant to section 1240, "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶]  (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶]  (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."  The theory underlying this exception is that "the declarant's lack of opportunity for reflection and deliberate fabrication supply an adequate assurance of the statement's trustworthiness.  [Citation.]"  (*Box v. California Date Growers Assn.* (1976) 57 Cal.App.3d 266, 272.)

"'To render [statements] admissible [under section 1240] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]"  (*People v. Poggi* (1988) 45 Cal.3d 306, 318.)  For purposes of this exception to the hearsay rule, "'[s]pontaneous' does not mean that the statement be made at the time of the incident, but rather in circumstances such that the statement is made without reflection.  [Citations.]"  (*People v. Hughey* (1987) 194 Cal.App.3d 1383, 1388; see also *People v. Farmer* (1989) 47 Cal.3d 888, 903, overruled on another ground in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)  ""'"Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance*." [Citation.]' [Citation.]"  (*People v. Thomas* (2011) 51 Cal.4th 449, 495-496.)

17.

"Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury. [Citation.] In performing this task, the court 'necessarily [exercises] some element of discretion ….' [Citation.]" (*People v. Poggi, supra,* 45 Cal.3d at p. 318.) The preliminary facts that bring statements within the exception require only proof by a preponderance of the evidence (*People v. Tewksbury* (1976) 15 Cal.3d 953, 966; *People v. Anthony O.* (1992) 5 Cal.App.4th 428, 433), and "we will uphold the trial court's determination if it is supported by substantial evidence. [Citation.] We review for abuse of discretion the ultimate decision whether to admit the evidence. [Citations.]" (*People v. Phillips* (2000) 22 Cal.4th 226, 236.) "Because the second requirement [viz., that the utterance must have been made before there has been time to contrive and misrepresent] relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met [citation]." (*People v. Poggi, supra,* 45 Cal.3d at pp. 318-319.)

Defendant claims Pestich's statements were not made before she had time to contrive and misrepresent. In support, he points to the fact Pestich did not immediately call 911, but rather called her daughter, who had to tell her to call the police. Defendant argues that by the time Pestich called 911, she had already told her story once, to her daughter; moreover, because the intruder told her not to call the police, she actively weighed in her mind whether to do so. As a result, he says, Pestich's call to 911 was not the product of an "unreflecting" mind, but rather was the result of a deliberative or reflective process.

As an initial matter, the record does not establish what, or how much, Pestich told her daughter. Pestich merely stated, "I told her, you know he told me not to call police you know." The trial testimony of Pestich's daughter, Angela Smith, is of no assistance, since Smith was unable to remember how long she spoke to Pestich.

In any event, for purposes of section 1240, "[a] spontaneous statement is one made without deliberation or reflection. [Citation.]" (*People v. Raley* (1992) 2 Cal.4th 870, 892.) "Whether the statement was made before there was 'time to contrive and misrepresent' is informed by a number of factors, including the passage of time between the startling occurrence and the statement, whether the statement was a response to questioning, and the declarant's emotional state and physical condition. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 925.)

At the time Pestich called 911, her arm was bruised and bloody and her back had been hurt. While these might not normally be considered significant injuries, we cannot ignore the fact Pestich was 92 years old. Moreover, the record shows Pestich was clearly emotional and distressed when she spoke to the 911 dispatcher. Although her tone of voice and inflection, as depicted by the actual recording of the call, suggest she was trying to rein in her emotions, many times her control dissolved and she moaned or cried and wailed. She was also clearly terrified her assailant would return. The spontaneous nature of her statements was not diminished by her assailant's directive not to report the crime. Under the circumstances, we cannot say the trial court erred in determining the statements were made while Pestich was still "under the domination of nervous excitement caused by the event, so that her utterances were spontaneous and unreflecting." (*People v. Blacksher, supra,* 52 Cal.4th at p. 810; compare *People v. Gonzales* (2012) 54 Cal.4th 1234, 1271 [statement properly admitted where witness testified declarant was crying when she telephoned and asked him to come and get her, crying when he picked her up from defendant's parents' house, and still upset and crying when she described the fight that day during which defendant hit her] with *People v. Smith* (2007) 40 Cal.4th 483, 518-519 [statement properly excluded where declarant did not tell witness of third party's admission he (not defendant) was the killer immediately upon returning to bedroom declarant shared with witness, but instead waited 30 minutes or an hour].) That there was an intervening event — Pestich's telephone call to her

19.

daughter — does not alter our conclusion. (See, e.g., *People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1589 [that declarant may have "had the wherewithal to drive herself and her child to the police station in order to make her escape" from defendant's domestic assault did not mean statements at police station lacked spontaneity as being made after opportunity to deliberate and reflect]; *People v. Gutierrez* (2000) 78 Cal.App.4th 170, 180-181 [rejecting claim declarant's statement (a written license plate number) was product of reflection because declarant had to go through process of observing license plate number, obtaining paper and writing implement, and reducing observation to writing].)

Defendant also argues Pestich did not call 911 until at least two hours after the incident. Even assuming a two-hour time lapse,[12] "'[t]he amount of time that passes between a startling event and subsequent declaration is not dispositive, but will be scrutinized, along with other factors, to determine if the speaker's mental state remains excited.' [Citations.]" (*People v. Clark, supra,* 52 Cal.4th at p. 926.) "The trial court must consider each fact pattern on its own merits and is vested with reasonable discretion in the matter. [Citation.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 719.)

On the fact pattern shown by the record here, the trial court clearly did not err by determining Pestich's mental state remained excited at the time she called 911.[13]

---

[12] The record establishes Pestich's 911 call was received at 2:57 a.m. It does not establish with any precision when the attack ended or when she called her daughter. Pestich told the 911 dispatcher her assailant came at 1:00 and "just" left. Defense counsel represented that Smith gave a statement in which she said Pestich telephoned her at 1:00 a.m. The prosecutor recalled Smith saying — some 11 years after events — she thought the telephone call was around 1:00 a.m.

[13] Spontaneous statements have been found to exist, under particular fact patterns, after even longer lapses of time. (See, e.g., *People v. Clark, supra,* 52 Cal.4th at pp. 925-926 [two- to seven-hour lapse between statement and event]; *People v. Brown* (2003) 31 Cal.4th 518, 541 [two-and-a-half-hour lapse]; *People v. Raley, supra,* 2 Cal.4th at pp. 893-894 [18-hour lapse]; *People v. Smith* (2005) 135 Cal.App.4th 914, 923-924 [three- to six-hour lapse], overruled on another ground in *People v. Garcia* (2008) 168

Moreover, the record clearly shows she remained excited and upset throughout the conversation, and was still extremely fearful when the police arrived. (See *People v. Lynch* (2010) 50 Cal.4th 693, 753-754, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637.) "'A statement made long after an observed act should generally be excluded because the declarant would no longer be under stress of excitement from the act observed. *But if the elapsed time is accounted for by shock, unconsciousness, or fear*, belated statements may still be admissible as spontaneous statements made while the declarant is under the stress of excitement. [Citation.]' [Citation.]" (*People v. Gutierrez, supra,* 78 Cal.App.4th at pp. 178-179, fn. 9, italics added.)

Finally, defendant claims Pestich was "distracted and seemingly equally as upset" by two prior incidents. Because a declaration "'must relate to the circumstance of the occurrence preceding it'" in order to be admissible under section 1240 (*People v. Poggi, supra*, 45 Cal.3d at p. 318), the argument runs, this circumstance weighs against admission of Pestich's statements to the 911 dispatcher.

We are aware of no authority holding that section 1240 requires a statement to relate *solely* to the circumstance of the startling or disturbing event preceding it. The main focus of Pestich's statements clearly was the attack in her home that precipitated her call for help. She made a single comment about being pulled down two blocks away. Her references to previously being robbed arose in the context of her relating that the *present* assailant looked for and asked about money, but there was none now because "he" or "they" took it two weeks earlier while she was working outside. Accordingly, the trial court was not required to conclude, as defendant now suggests, that Pestich "was just

Cal.App.4th 261, 291-292; *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1713 [one- to two-day lapse].)

21.

as likely importuning God as to why **all** of these recent things had happened to her, rather than merely recounting the most recent upsetting event."

    2.    <u>Confrontation</u>

Defendant says that, even assuming the 911 call fell within the purview of section 1240, Pestich's statements to the dispatcher were "testimonial"; hence, their admission violated his right to confrontation under the Sixth Amendment to the United States Constitution. There is some disagreement among appellate courts concerning whether circumstances exist under which an utterance qualifying as a spontaneous statement will ever be testimonial. (Compare *People v. Johnson* (2010) 189 Cal.App.4th 1216, 1222 with *People v. Corella* (2004) 122 Cal.App.4th 461, 469.) We need not take sides in the dispute; rather, we assume such circumstances exist and independently review the trial court's determination of the constitutional issue. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1477-1478.)

"The Sixth Amendment of the federal Constitution provides that a defendant has the right to confront the witnesses against him. In *Crawford*, the United States Supreme Court held that admission of a 'testimonial' hearsay statement by a declarant who does not appear for cross-examination at trial violates the confrontation clause unless the witness is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the witness. (*Crawford*, *supra*, 541 U.S. at pp. 59, 68.) This rule applies even if the statement is otherwise admissible under a hearsay exception. (*Id*. at pp. 50-51, 56 & fn. 7.) However, the confrontation clause does not bar admission of hearsay statements that are not testimonial. (*Davis v. Washington* (2006) 547 U.S. 813, 823-826 (*Davis*).)" (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1463.)[14] "'Statements are

---

[14]    Defendant asserts that, since the admission of hearsay statements deprives an accused of the right to confront and cross-examine a witness against him, any state exception to the hearsay rule must satisfy the requirements of the federal confrontation clause. To do so, he says, the statements must contain particularized guarantees of

22.

nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'  [Citation.]"  (*People v. Romero* (2008) 44 Cal.4th 386, 421-422.)

---

trustworthiness, such that adversarial testing by cross-examination would be expected to add little or nothing to their reliability.  Thus, he continues, "incriminating statements that may be admissible under an exception to hearsay still may not meet requirements of the federal Confrontation Clause, unless the prosecution also demonstrates the hearsay statement bears adequate indicia of reliability."

The cases on which defendant relies all undertake, either directly or through the precedent they cite, the pre-*Crawford* confrontation clause analysis required by *Ohio v. Roberts* (1980) 448 U.S. 56, 66 (*Roberts*), viz., "that the veracity of hearsay statements is sufficiently dependable to allow the untested [by cross-examination] admission of such statements against an accused when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability. [Citation.]" (*Lilly v. Virginia* (1999) 527 U.S. 116, 124-125 (plur. opn. of Stevens, J.).)  With *Crawford* and *Davis*, however, *Roberts* has been overruled for all purposes. (*People v. Cage, supra,* 40 Cal.4th at pp. 981-982, fn. 10.)  Accordingly, it is now "clear that reliability is not part of the inquiry under the confrontation clause[.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 343.)  "Only [testimonial statements] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause.  [Citation.]  It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Davis*, *supra*, 547 U.S. at p. 821.)  "Accordingly, after *Davis*, the determination of whether the admission of a hearsay statement violates a defendant's rights under the confrontation clause turns on whether the statement is testimonial.  If the statement is testimonial, it must be excluded unless the declarant is unavailable as a witness and the defendant had a prior opportunity to cross-examine the declarant.  If the statement is not testimonial, it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule." (*People v. Garcia, supra,* 168 Cal.App.4th at p. 291; see *People v. Cage, supra,* 40 Cal.4th at p. 981 & fn. 10, 984.)

In *Michigan v. Bryant* (2011) 562 U.S. ___ [131 S.Ct. 1143] (*Bryant*), police responding to a call that a man had been shot, found the victim lying in a gas station parking lot with a gunshot wound to his abdomen. The officers asked him what happened, who shot him, and where the shooting took place. The United States Supreme Court concluded the victim's statements identifying and describing the shooter and the location of the shooting were not testimonial. (*Id*. at p. 1150.)

Our state Supreme Court has summarized post-*Bryant* confrontation clause analysis as follows:

> "It is the 'primary purpose of creating an out-of-court substitute for trial testimony' that implicates the confrontation clause. [Citation.] Consequently, if a statement is not offered for its truth, or is nontestimonial in character, the confrontation clause is not a bar to admission. Thus, the touchstone questions are whether a statement is hearsay offered against a criminal defendant, whether the statement is otherwise admissible under a hearsay exception, and, if so, whether the statement is testimonial.

> "*Bryant* counsels that to determine the primary purpose with which a statement is given by the declarant or obtained by an officer a court must consider a number of factors:

> "(1) The court must objectively evaluate the circumstances of the encounter along with the statements and actions of the parties. In this latter regard, 'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions' in the given situation. [Citation.]

> "The inquiry is on the *primary* purpose of both officer and declarant. A majority of the court in *Bryant* recognized that both participants may have mixed motives. An officer, even when responding to an emergency, remains an investigator and, thus, is not indifferent to the gathering of evidence. Likewise, victims and other declarants may or may not want to see a perpetrator ultimately prosecuted. The question remains, when viewed objectively, what is the *primary* purpose of both declarant and officer? [Citation.]

> "(2) The court should consider whether an '"ongoing emergency"' exists, or appears to exist, when the statement was made. Such an ongoing

emergency focuses the participants on something other than obtaining evidence for trial. [Citation.] Again, the analysis is objective. Even if hindsight reveals that an emergency did not, in fact, exist, if it reasonably appeared to exist based on the information known when the statement was made the emergency test is satisfied. [Citation.] [¶] … [¶]

"(3) Whether an ongoing emergency exists is a 'highly context-dependent inquiry.' [Citation.] Even when a threat to an initial victim is over, a threat to first responders and the public may still exist. The type of weapon involved may expand or limit the duration and scope of the emergency. A situation created by the use of fists may involve less ongoing danger than the use of a firearm. [Citation.]

"(4) The medical condition of the declarant is a relevant consideration, as it bears on both the injured declarant's purpose in speaking and the potential scope of the emergency. [Citation.] As the high court describes it, the declarant's medical condition 'sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one.' [Citation.]

"(5) A nontestimonial encounter addressing an emergency may evolve, converting subsequent statements into testimonial ones. A real or apparent emergency may resolve itself. The disarming or capture of a perpetrator may end the danger. It may become clear from the declarant's and officer's statements or behavior that the focus has shifted from meeting the emergency to obtaining evidence for trial. [Citation.]

"(6) Finally, regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition are important considerations. Inquiries that are conducted in a disorganized way and in turbulent circumstances are distinguishable from a jailhouse interview, as in *Crawford*, or the sequestered and formal preparation of an affidavit, as in *Hammon v. State* [*Davis*'s companion case]. [Citation.]" (*People v. Blacksher, supra,* 52 Cal.4th at pp. 813-815.)

Applying this analysis to the present case, we conclude Pestich's statements to the 911 dispatcher were not testimonial: An objective assessment of Pestich's encounter with the 911 dispatcher demonstrates the primary purpose was to meet an ongoing emergency.

25.

With respect to the circumstances in which the encounter occurred, defendant points out the dispatcher "very quickly" determined the assailant did not use a weapon and had left Pestich's home, and Pestich did not think she needed an ambulance and had already telephoned her daughter. Before learning any of this, however, the dispatcher found out Pestich was 92 years old, had been attacked by someone who came into her house and tried to rape her, was distraught and extremely fearful because the man told her not to call the police and she worried he could come back, had been knocked down in the bathroom and so had hurt her arm and back, was bleeding from her arm, and was home all alone. Although Pestich said she did not think she needed an ambulance, she immediately qualified that response with, "I don't know yet." Given her age and the fact she had suffered some injuries, as well as the fact her assailant was still on the loose (insofar as anyone knew, having merely gone across the street), we conclude a reasonable person in the parties' position would have believed the emergency had not, as defendant contends, ended.

We further conclude an objective evaluation of the statements and actions of Pestich and the dispatcher demonstrates the primary purpose of both individuals was to deal with the ongoing emergency, and not to create an out-of-court substitute for trial testimony. Although the assailant had left Pestich's house, he apparently had merely walked across the street. There was nothing to suggest Pestich would have the strength or wherewithal to thwart another attack should he return. Moreover, the circumstances of the encounter were fairly chaotic, with Pestich still being upset and excited by what had occurred, and the dispatcher having to try to focus her on the dispatcher's questions in order to obtain any information.

That the dispatcher asked Pestich what her assailant did to her, tried to get a description of him, and asked if Pestich could think of anything else that could help police catch him, does not alter our conclusion. Several cases are instructive. In *People v. Blacksher*, *supra*, 52 Cal.4th at pages 816 through 817, the California Supreme Court

26.

found the declarant's statements to an officer, made during a conversation in which the officer asked questions about the shooting, what the perpetrator was wearing, and whether he was armed, nontestimonial. The court found the primary purpose for both officer and declarant "was to determine defendant's whereabouts and evaluate the nature and extent of the threat he posed." (*Id.* at p. 816.) The court noted that the declarant was "greatly upset" throughout her encounter with the officer; moreover, their conversation occurred in an open setting (the declarant's yard) and under chaotic conditions. As a result, it was more similar to the parking lot questioning in *Bryant* than the circumstances of *Crawford*, which were calmer and more formal inasmuch as the declarant was in police custody and was herself a possible suspect. (*People v. Blacksher*, *supra*, at pp. 816-817 & fn. 28.)

In *People v. Romero*, *supra*, 44 Cal.4th at page 422, the California Supreme Court concluded the victim's statements to an officer were not testimonial.[15] The court reasoned: "Officer Burke, responding to an emergency call, encountered an agitated victim of a serious assault, who described defendant's attack on him with a small ax. The statements provided the police with information necessary for them to assess and deal with the situation, *including taking steps to evaluate potential threats to others by the perpetrators, and to apprehend the perpetrators*. The statements were not made primarily for the purpose of producing evidence for a later trial and thus were not testimonial." (Italics added.)

In *People v. Gann* (2011) 193 Cal.App.4th 994, 1008, the Court of Appeal stated: "[A] 911 call made during the course of an emergency situation is ordinarily made for the primary nontestimonial purpose of alerting the police about the situation and to provide

---

[15]    Although the issue arose during the penalty phase of trial, the high court assumed the federal constitutional right to confront and cross-examine witnesses applied. (*People v. Romero, supra,* 44 Cal.4th at p. 421.)

information germane to dealing with the emergency."  The court found the declarant's statements to the 911 operator nontestimonial:  The information given was not formal or structured; moreover, the dispatcher was mainly concerned "with what was happening at the moment *in order to obtain information that would assist responding officers in rendering aid to the victims and finding the escaping perpetrator* — not to secure a conviction in a court trial."  (*Ibid*., italics added.)

In *People v. Brenn* (2007) 152 Cal.App.4th 166, the defendant and Zupsic got into a fight.  Later, the defendant stabbed Zupsic, who called 911.  (*Id*. at pp. 169-170.)  The appellate court held his statements during the 911 call and his subsequent statements to a police officer were nontestimonial.  (*Id*. at p. 176.)  The court reasoned:

> "To begin with, the purpose and form of the statements were not the functional equivalents of trial testimony.  During the 911 call, Zupsic made his statements in response to rapid-fire questioning from the dispatcher.  There was nothing formal, solemn or structured about the colloquy.  And unlike a criminal prosecutor, the dispatcher was primarily concerned with what was happening at the moment, as opposed to what had happened in the past.  The dispatcher was eliciting information in an attempt to assess the present situation and help Zupsic and the responding officers, not secure a conviction in a court of law.

> "At one point during the call, Zupsic did say he wanted to 'press charges.'  But it does not appear that his primary purpose during the call was to establish past facts for use in a criminal trial, or that the 911 operator was concerned about that issue.  … [*People v. Cage*, *supra*, 40 Cal.4th 965,] is instructive.  Our Supreme Court emphasized there that 'the proper focus is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial.  Instead, we are concerned with statements, made with some formality, which, viewed objectively, are for the primary purpose of establishing or proving facts for possible use in a criminal trial.'  [Citation.]

> "Much of the information Zupsic provided to the 911 dispatcher pertained to who and where he was, what he was calling about, *where the suspect was located, what the suspect looked like, and what he might be expected to do*.  Background information of this sort would be expected of

anyone calling the police during an emergency situation. It is not typically grist for a prosecutor's closing argument.

> "Appellant questions whether Zupsic was facing an emergency at all, given that he had gone next door to call the police. This is an argument much easier to make from a law office than from 100 feet from someone who has just stabbed you. At the time of the call, Zupsic was suffering from a fresh stab wound, appellant was still at large, and it was unclear whether he still had any weapons or was searching for Zupsic." (*People v. Brenn, supra,* 152 Cal.App.4th at pp. 176-177, original italics omitted, italics added.)

These cases make clear that statements made in response to questions asked with a purpose of assisting in the apprehension of a perpetrator are not necessarily testimonial. Under the circumstances here, there remained a very real threat at least to Pestich, even if the apparent absence of a weapon limited the threat that might be faced by first responders or other members of the public.

Defendant points to the dispatcher's questions to Pestich concerning whether the perpetrator left anything behind, such as a condom. Even assuming the trial court should have excluded, as testimonial, this portion of the conversation, which occurred immediately before the officers arrived, we see no prejudice. "'Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24.' [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error. [Citation.]" (*People v. Loy* (2011) 52 Cal.4th 46, 69-70.) Since the dispatcher's questions in this regard elicited no information about possible evidence left behind, any conceivable error was clearly harmless beyond a reasonable doubt.

## II

### INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends he was deprived of his constitutional right to the effective assistance of counsel when his trial attorney "opened the door" to previously excluded evidence; hence, his convictions on all counts must be reversed. We disagree.

29.

## A.    Background

In somewhat colloquial terms, Pestich told the 911 dispatcher that after defendant made her masturbate him, his ejaculate spilled on her legs or foot.  She also told this to one of the responding officers.  During a section 402 hearing, Detective Weiss testified that she was assigned this case on April 20, 1999, and interviewed Pestich at Pestich's home fairly shortly thereafter.  Pestich related that a rug had been on the side of the bed where she was sitting when she was sexually assaulted, and that the semen had gone onto the rug.  After, Pestich put the rug in the laundry room.  As a result, Weiss seized the rug from the laundry room so it could be tested for possible biological evidence.

The trial court ruled Weiss could testify to collecting the rug, but not that Pestich told her about it.  The court found Pestich's statements in that regard to be testimonial and, hence, inadmissible.

Through his cross-examination of various witnesses, defense counsel sought to establish that the rug on which defendant's DNA was found could not be positively identified as the rug that had been in Pestich's bedroom.  He also implied the biological evidence had been planted, most likely by Weiss.

In the course of his cross-examination of Weiss, defense counsel asked if it was correct that she "seized the rug off the washing machine … because of something Ms. Pestich told [her] about the rug …."  Weiss answered affirmatively.  Counsel then questioned Weiss about her awareness, back in 1999, of DNA evidence, and elicited that if defendant were "a 290 registrant" and required to give a blood sample, his blood sample would have been on record in April 1999.

Defense counsel further established that, insofar as Weiss knew, there was no evidence defendant assaulted Pestich aside from the DNA evidence found on the rug.  He elicited that Weiss did not know how common the rug was or if similar rugs were available at the time.  He asked how difficult it would have been for someone to get a rug with defendant's semen on it, but the prosecutor's objection — that the question called

for speculation — was sustained.  Defense counsel then elicited that, as far as Weiss knew, no testing was done to determine whether Pestich's DNA was on the rug.  This followed:

> "Q [by defense counsel]  Okay.  Did Ms. Pestich give you any information that indicated to you that her DNA may have been on the rug?
>
> "A [by Weiss]  No.
>
> "Q  Okay.  *Did she ever advise you as to whether or not the rug was used to wipe semen off of her leg?*
>
> "A  *I believe that did happen.*
>
> "Q  Okay.  Are you aware whether or not DNA can be transferred by wiping skin to skin on an object?
>
> "A  Yes.
>
> "Q  Okay.  Do you know if this rug was ever tested as to whether Ms. Pestich's DNA was, in fact, on that rug?
>
> "A  No.  I have no idea."  (Italics added.)

At the conclusion of cross-examination, a sidebar conference was held.  The court advised both counsel of its view that defense examination had opened up for redirect examination the subject of Pestich's statements to Weiss about wiping the semen onto the rug.[16]

On redirect examination, the prosecutor elicited that, in the original police report, the sweat pants and the rug were described as being on the floor of the bedroom.  The prosecutor further elicited Weiss's denial that she ever collected any semen from defendant, and that her only contact with him was when she interviewed him on May 9, 2003.  The prosecutor elicited that Weiss collected the rug during her initial meeting with

---

**16**     The court described the sidebar conference for the record, and clarified why it had changed its earlier ruling excluding Pestich's statements, during a recess later in the day.

Pestich, and that she did so based on the information Pestich related about how the rug was used during the assault, specifically, "[t]hat she'd used the -- when he ejaculated, some of it got on her leg, and she used the rug to wipe her leg."

**B.      Analysis**

Defendant contends Pestich's statement about the rug was the link connecting the unknown intruder to the forensic identification of defendant as that person.  Defendant says there was no strategic reason for defense counsel to elicit "incredibly harmful" evidence counsel himself had succeeded in keeping out, and that admission of the evidence "essentially hammered the nails into [defendant's] coffin .…"

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.)  "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings.  [Citations.]  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citations.]"  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)  Inadequate performance must be shown by a preponderance of the evidence.  (*In re Thomas* (2006) 37 Cal.4th 1249, 1257.)

"It is not deficient performance for a criminal defendant's counsel to make a reasonable tactical choice.  [Citations.]  Reasonableness must be assessed through the likely perspective of counsel at the time."  (*People v. Ochoa* (1998) 19 Cal.4th 353, 445, fn. omitted.)  In the midst of trial, "defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings."  (*People v. Frierson* (1991) 53 Cal.3d 730, 749.)  However, a defendant "'can reasonably expect that

32.

in the course of representation his counsel will undertake only those actions that a reasonably competent attorney would undertake. But he can also reasonably expect that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. [Citations.] If counsel fails to make such a decision, his action — no matter how unobjectionable in the abstract — is professionally deficient.' [Citation.]" (*In re Gay* (1998) 19 Cal.4th 771, 807.)

A defendant who claims ineffective assistance of counsel on appeal "must establish deficient performance based upon the four corners of the record." (*People v. Cunningham, supra,* 25 Cal.4th at p. 1003.) "If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.)

In the present case, the trial court's ruling excluding Pestich's statement to Weiss was made fairly early in the proceedings. It is entirely possible that, as testimony — and especially the examination of Weiss — proceeded, defense counsel altered his strategy with respect to whether to place the statement before the jury. The record on appeal neither sheds light on why trial counsel acted as he did nor does it preclude the possibility of a satisfactory explanation for counsel's conduct. Accordingly, we reject defendant's claim the issue is cognizable on direct appeal. (See, e.g., *People v. Bell* (1989) 49 Cal.3d 502, 546; *People v. Hinds* (2003) 108 Cal.App.4th 897, 902; *People v. Jimenez* (1992) 8 Cal.App.4th 391, 397-398.)

Nor has defendant established prejudice. "'[T]o be entitled to reversal of a judgment on grounds that counsel did not provide constitutionally adequate assistance, the petitioner must carry his burden of proving prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.' [Citation.]" (*People v. McPeters* (1992) 2 Cal.4th 1148, 1177, superseded by statute on another point as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106-1107, 1116; accord, *People v. Williams* (1988) 44 Cal.3d 883, 933.)

Defendant says DNA evidence on the rug, standing alone, was insufficient to show he was Pestich's assailant. He suggests that, since he lived in the neighborhood, jurors could have inferred he owned the rug, his DNA got on it somehow, he discarded the rug, and Pestich retrieved it from the trash. Alternatively, he points to the testimony of Pestich's daughter, that people sometimes came into the house while Pestich was in the backyard and stole things from the house. From this, he posits jurors could have inferred defendant came into Pestich's home while she was outside and masturbated on the rug.

These scenarios are speculative in the extreme. Given Weiss's testimony about interviewing Pestich, jurors would have been much more likely to infer Weiss seized the rug (1) as a result of something Pestich told her, or (2) on the off chance it might contain evidence. Significantly, the defense theory of the case was that the People had failed to prove the rug on which defendant's DNA was found was the same rug that had been in Pestich's bedroom, and that if it was the same rug, Weiss planted the biological evidence. The testimony defendant now chides defense counsel for eliciting did not undercut those theories in any respect, and defense counsel was able to forcefully argue them to the jury.

## **DISPOSITION**

The judgment is affirmed.

_____

DETJEN, J.

WE CONCUR:

_____

WISEMAN, Acting P.J.

_____

LEVY, J.